[Argued March 23, 1893; decided April 4, 1893.]

## ODD FELLOWS' ASSOCIATION *v.* HEGELE.

[S. C. 32 Pac. Rep. 679.]

1. PARTY-WALL EASEMENT.— Easements in party walls are mutual, and relate to the wall only; they continue only so long as the walls remain safe and suitable for use.

2. PARTY-WALL AGREEMENT — EASEMENT.— A provision in a party-wall agreement that the rights of the parties shall continue "so long as the wall shall stand," does not mean so long as any fragment of the wall itself shall remain, but it means so long as the wall shall continue fit and suitable for its purpose; and this construction of such a clause does not confer any perpetual right or easement.

3. RESCISSION OF CONTRACT — EQUITY — ULTRA VIRES.— An agreement will not be rescinded at the instance of a corporation as being *ultra vires* and voidable, after the parties have acquiesced therein for more than fifteen years, and large expenditures have been incurred and improvements made upon the faith thereof, and the corporation has received commensurate benefits and been relieved from burdensome obligations.

4. CORPORATIONS — ULTRA VIRES.— Where a corporation organized to buy and hold real estate for the use and occupation of the lodges of a social order, and to generally advance the good of the order, has erected a building for the use of the different lodges, and rents the lower part for stores, it has power to grant to another person the use of an alley across the premises in consideration of reciprocal benefits; such a grant is not necessarily *ultra vires* because it deprives the corporation of the exclusive use of all the lot, for it may be essential to the better use and enjoyment of the building.

Multnomah County: LOYAL B. STEARNS, Judge.

Suit by the Odd Fellows' Hall Association of Portland, Oregon, against Charles Hegele, to rescind and cancel a party-wall agreement. From a decree for defendant, plaintiff appeals. Affirmed.

This is a suit for the rescission and cancellation of a party-wall agreement, in writing, entered into by the plaintiff and the grantors of the defendant on the fifteenth day of May, 1876. The plaintiff is a private corporation, incorporated under the laws of this state, and, among other things, is authorized and empowered to buy real

estate, and erect buildings thereon suitable "for the use and occupation of the several lodges and encampments of the Independent Order of Odd Fellows in the City of Portland, as well as such other buildings as may be erected for the benefit of said lodges and encampments, and of doing any and all other things necessary and essential to carry on said business, or to advance the good of said order in said city." The facts substantially are that on the tenth day of April, 1869, the plaintiff purchased of G. W. Vaughn, and the said Vaughn, by deed of bargain and sale, but without covenants of warranty, conveyed to the plaintiff, all lot one in block fifteen in the City of Portland, Oregon. The consideration of said deed was twenty-two thousand dollars, and an agreement on the part of the plaintiff to erect during the year 1869, and forever maintain, certain walls in said agreement described on the line between said lot one and lot two, and on the line between said lot one and lot eight, in said block fifteen, so that one-half of the walls should rest upon lot one, and the other half upon lots two and eight; and by the said agreement the said G. W. Vaughn, his heirs or assigns, were granted the right and perpetual privilege and license to use said walls for the construction and support of any brick or stone buildings which the said Vaughn, his heirs or assigns, might thereafter erect on said lots two and eight, or either of them. The lot is one hundred feet long and fifty feet wide. The plaintiff shortly thereafter procured plans and specifications for a building fifty feet wide and ninety-five feet long, and erected the building now standing upon said lot one according to said plans and specifications. The wall of said building, for a distance of ninety-five feet from the east line of said lot one, rests upon the line between lots one and two, but the plaintiff never erected a wall upon the remaining five feet along the line between lots one and two, nor along the line between lots one and eight, but did erect a wall running the

XXIV. OR.— 2.

whole width of said lot, parallel with, and five feet east of
the line between lots one and eight.   On the tenth day of
August, 1875, C. A. Alisky and the defendant purchased
the east twenty feet of lot eight in block fifteen, and on
the twenty-fifth day of March, 1882, the said Alisky con-
veyed all his interest therein to defendant, who now owns
the whole thereof.

On the fifteenth day of May, 1876 the said Alisky and
the defendant, then owning lot two, and the east twenty
feet of lot eight, in said block, as parties of the first part,
entered into an agreement with the plaintiff, as the party
of the second part, wherein and whereby the said Alisky
& Hegele agreed to remove the water closets then on the
west end of said lot one, and erect them on lot two near
the southwest corner of lot one, "with good and conven-
ient passage ways leading to the first and second floors of
the building on said lot one, block fifteen, said passage
ways to be so located as to leave an alley way in the rear
of the west end of said building, the whole width of said
building on the ground thereof, and five feet wide, said
alley way to be kept in repair by the said parties of the
first part, their heirs and legal representatives and assigns,
and said alley way and water closets to be used in common
so long as the present west wall on said building on lot
one shall stand, by the said parties of the first part and
second part, their, and each of their, successors, heirs, and
assigns;" and by the said agreement, the parties of the
first part further covenanted and agreed to erect and keep
in repair a "passage way from the door now in the west
wall of the building on said lot one, in the second floor of
said building, to the water closet to be erected on the
premises of said parties of the first part, near the south-
west corner of said lot one, and level with the second floor
of said building on said lot one, said passage way to oc-
cupy in width the distance between the west wall of the
building now on said lot one, and the west line of said lot

one, and to extend south from the doorway aforesaid to said water closet, said passage way to be used in common as long as the west wall of said building on said lot one shall stand, by said parties of the first part and second part, and each of their successors, heirs, and assigns. Upon the said considerations, the said parties of the first part do further covenant and agree, as aforesaid, to so construct the said improvements, and the improvements on their own premises, as not to cut off the light from the south side of the room in the southwest corner of the second floor of said building on lot one, nor from the west end of the stores on the ground floor thereof, and do covenant and agree to put in a skylight sufficient to throw light through the glass door in the west end of the hall on the second floor of said building on lot one; and lastly, the parties of the first part, upon the consideration aforesaid, do covenant and agree, as aforesaid, to accept the walls as now erected and completed upon said lot one, in full satisfaction of the said agreement between Vaughn and plaintiff, concerning the division and party walls, and to relinquish and cancel any and all claims and rights thereunder to any and all walls not already constructed upon the lines of said lots mentioned in the agreement last mentioned."

Plaintiff, on its part, among other things, covenanted and agreed that the parties of the first part should have an easement and right to use the west wall of the building on lot one as a party wall, and to occupy in common with the party of the second part the said alley ways and passage ways; that the parties of the first part should have the right of ingress and egress to the building about to be erected west of the said building on lot one, and through the main entrance and stairway and hall in the building on lot one, and through the door in the west wall of said building on the second floor; that the part of lot one lying north and west of said doorway should be used exclusively

by the parties of the first part,—all rights and privileges as granted to continue no longer than said wall should stand.

After the execution of the said agreement, and during the year 1876, the said Alisky & Hegele erected a building upon lot two in said block, and so erected it as "not to cut off the light from the south side of the room in the southwest corner of the second floor of said building on lot one," and did remove the water closets mentioned in said agreement, the one on the ground floor onto lot two, according to said agreement, but the water closet on the second floor was not removed from lot one onto lot two, as specified in said agreement, but was removed to the south end of the alley or passage way leading from the west door to the second story, and placed on lot one just north of the south line thereof. The hall committee and the board of directors of plaintiff had knowledge of, and acquiesced in, without objection, and assented to, the location of the said closet where it now stands. In all other particulars the said Alisky & Hegele complied with and performed the said contract. Instead of having only a five-foot hall or passage way to said closet in the second story, Alisky & Hegele left and made a hallway about eight feet wide, and made the said closet larger than it was originally, and larger than they were required to do by said contract. The plaintiff and its tenants have had the use and benefit of said hallway and closet ever since its removal as aforesaid. By the erection of said closet where it now stands, it in no manner cut off or obstructed the light to the window of the room in the south side of the southwest room in plaintiff's building; whereas, if said closet had been placed in the location designated in said written agreement it would, to some extent, in the afternoons, have obstructed the light to said window, and thereby darkened said room.

*Lewis L. McArthur* (*William D. Fenton* and *Earl C. Bronaugh* on the brief), for Appellant.

*Cyrus A. Dolph* (*Rufus Mallory* and *Jos. Simon* on the brief), for Respondent.

MR. CHIEF JUSTICE LORD delivered the opinion of the court.

The complaint contains an allegation to which no reference is made in the statement of facts, to the effect that the original agreement between the plaintiff and Vaughn was subsequently modified by a verbal agreement; but there is no evidence disclosed by the record to sustain such allegation, nor to show, if there was, that either Alisky or the defendant Hegele, the grantees of Vaughn, had notice of any modification of such agreement, so that we are not required to consider the effect of that allegation as a feature of the case.

1.   The facts, as stated, show that the original agreement provided for the erection of party walls on lot one, which lot was one hundred feet long and fifty feet wide, so that one-half of such walls should rest upon lot one, and the other half upon lots two and eight; that shortly thereafter the plaintiff erected the building now standing upon lot one, ninety-five feet long, and thereby left a strip of ground five feet in width from east to west and fifty feet in length from north to south, between the rear wall of the building and the western boundary of lot one; and the facts also disclose the modifications which were effected in the original contract by the agreement of 1876 between the plaintiff and Alisky.   The contention for the plaintiff is that the provision in the last agreement, "so long as the west wall of said building shall stand," when construed with reference to the provision that "no perpetual right or easement shall be thereby acquired" in the land of either party implies or gives the right to the plaintiff to remove the wall whenever, in the opinion of its directors, the convenience or necessities of the association may demand or require it; for the reason, it is argued, that if the expres-

sion "so long as the west wall shall stand" shall be construed by the court to mean until such wall shall be destroyed by fire, or flood, or the ravages of time, the effect will be to create in the defendant a perpetual easement, contrary to the provisions of the contract. This result is based on the assumption that we will construe the expression "so long as the west wall shall stand" to mean, as counsel thinks, that if, after the destruction of the buildings, any fragment of the wall, or the wall itself, remains, though unfit for use, it still stands charged with the burdens and benefits of the easement. But we shall not so construe the phrase, as we think such construction would be inconsistent with its meaning, as well as the doctrine of property rights in land. Under the agreement, there was no grant of any easement in the land. By its terms each party possesses the right to a reasonable use of the wall, or to an easement of support to his building in it, "so long as the west wall shall stand," but it is equally plain by its terms, also, that such use or easement is not a perpetual party-wall easement. The agreement is binding on the parties during the existence of the wall, or, as it is phrased, "so long as it shall stand."

An explanation of this phrase may be aided by understanding the nature of an easement in a party wall, and the purpose it is designed to serve and accomplish. A party wall is a wall built partly on the land of another for the common benefit of both. The adjoining owners are not joint owners, or tenants in common, of the party wall. "Each is possessed in severalty of his own soil up to the dividing line, and of that portion of the wall which rests upon it; but the soil of each, with the wall belonging to him, is burdened with an easement or servitude in favor of the other to the end that it may afford a support to the wall and buildings of such other": *Hoffman* v. *Kuhn*, 57 Miss. 746 (34 Am. Rep. 491). The purpose of the wall is to support the timbers of the contiguous buildings. The

easements are mutual, and relate to the wall only, and necessarily continue no longer than the wall remains safe and fit for the purpose it was intended to serve.  As long as the wall remains fit and suitable for use, the easements of support exist; when the wall becomes unfit, either from age or accident, the easement in it ceases.  In *Campbell* v. *Mesier*, 4 John Ch. 334 (8 Am. Dec. 570), it is indicated that the easement is a grant in fee, and that the right of support continues longer than the existence and fitness of the old wall.  But in *Sherred* v. *Cisco*, 4 Sandf. 480, it was held that if the wall be destroyed by fire or accident, the adjoining owners are not bound to rebuild it.  The land becomes freed from all servitude in relation to the party wall, as in the case of two adjoining lots without buildings. SANDFORD, J., said: "It was argued that the fact of there having formerly been a party wall gives the right to have it continued for all time to come.  To test this argument fairly, we will assume what is not proven, but may, perhaps, be fairly inferred, that the old wall was built by mutual agreement, and at the expense of the proprietors of the two lots.  It is not disputed that each proprietor remained the owner in severalty of the ground on which half of the wall rested, and of course each owned in severalty one half of the wall.  Neither party had a right to pull down the wall without the other's consent; and to that extent, the agreement upon which it was erected controlled the exclusive dominion which each would otherwise have had over half of the wall, as well as over the soil on which it stood."

2.  The object of the wall is to support the houses of which it forms a part, and, so long as it stands and answers that purpose, it cannot be changed, or removed, or rebuilt, without an agreement therefor.  But when that state of affairs occurs which renders the party wall useless, whether from fire or flood, the ravages of time, or accident, though it may still stand, "the mutual easements,"

as DENIO, C. J., said, "have become inapplicable, and each proprietor may build as he pleases on his own land without any obligation to accommodate the other." So long as the wall stands fit and suitable for the original purpose for which it was erected, the right of support continues. But when, after the destruction of the buildings, it remains or stands dilapidated, or useless,— unfit and unsafe to be used as a party wall,— it does not stand, in legal contemplation, as a party wall. As illustrative of the general doctrine involved, we may further refer to *Heartt* v. *Kruger*, 121 N. Y. 386 (18 Am. St. Rep. 829; 24 N. E. Rep. 841; 9 L. R. A. 135); *Phillips* v. *Bordman*, 4 Allen,.147; *Miller* v. *Brown*, 33 Ohio St. 547; *Antomarchi's Exr.* v. *Russell*, 63 Ala. 359 (35 Am. Rep. 40); *Hoffman* v. *Kuhn*, 51 Miss. 746 (34 Am. Rep. 491); *Glenn* v. *Davis*, 35 Md. 219 (6 Am. Rep. 389). As we do not think the phrase "so long as the wall shall stand" is susceptible of the construction assumed, it does not violate the agreement by creating a perpetual party-wall easement. In *Hoffman* v. *Kuhn*, 51 Miss. 746, the court, after observing that each owner is bound to permit his portion of the wall to stand, and to do no act to impair or to endanger the strength of his neighbor's portion, so long as the object for which it was erected, to wit, the common support of the buildings, can be served, proceeded to say: "But the obligation ceases with the purpose for which it was used, namely, the support of the houses of which the wall forms a part. If these houses or either of them are destroyed, without fault upon the part of the owner, he is not bound to rebuild in exactly the same style, and exactly in the same spot because his neighbor demands it. That this is true where the wall itself is swept away is settled by authority. It must be equally so where the wall alone remains. A wall is but a portion of the house, and the one is valueless without the other. To hold that so long as the wall stands the owner whose house has been destroyed is com-

pelled to lose his lot, or to replace the destroyed building with another of exactly the same pattern, is to sacrifice the greater to the less, and to impose in perpetuity a servitude which was assumed only for a specific purpose."

3.   It is next claimed that the agreement is *ultra vires* or voidable, for the reason that the plaintiff was thereby divested of the right to the exclusive use of the five feet of ground off the west end of the land owned by it, which, although not necessary for the purposes of the association when the agreement was made, became so, as it is claimed, by reason of the organization of new lodges since that date.   The facts show that Alisky & Hegele performed the covenants contained in their agreement to the satisfaction of the plaintiff, the board of directors and stockholders. The claims made by them under the agreement of 1869 were understood by the association when the proposed agreement modifying it was submitted.   The matter was then fully considered, and the agreement made, which for many years, so far as the evidence discloses, was entirely satisfactory to all the parties.   There is no pretense of any fraud or misrepresentation.   In fact the association desired to obtain relief from the agreement of 1869.   That agreement imposed burdens, which, to say the least, were inconvenient for it to perform, and from which it sought to be relieved by the subsequent agreement.   The rights surrendered by Alisky & Hegele, in the light of all the circumstances, were fully equal in value to all that were surrendered by the plaintiff.   The improvements were made by Alisky & Hegele in pursuance of plans submitted to plaintiff's board of directors before the agreement was entered into, and they were made under the supervision of a committee of that board.   The buildings were constructed to correspond with plaintiff's building at an extra expense of two thousand dollars, and so as not to cut off the light from the rooms of the association.   All these improvements were made during the year 1876, and

accepted in full satisfaction of, and in compliance with, the covenants on the part of Alisky & Hegele contained in the agreement. The agreements were recorded, and the buildings have been standing since their construction; so that, in both ways, there has been to every one interested a continuing notice of the terms upon which the rights of the respective parties under the agreement of 1869 had been modified and adjusted. Nor is it within the power of the plaintiff to place the other parties in the position they were before the agreement. Under such circumstances a court of equity does not listen with much satisfaction to the complaint of a company that transactions were illegal, or in excess of its powers, which it had approved, which were essential to its protection, and the benefits of which it received.

"The rule is a wholesome one," said HARLAN, J., "that requires the court in case of merely voidable contracts to withhold relief from those who, with knowledge of the facts, or with full opportunity to ascertain the facts, unreasonably postpone application for relief. Seasonable resistance cannot be predicated of a case of a merely voidable contract, where the party complaining has not simply been silent for twenty years, but with knowledge of the facts, or with full opportunity to ascertain them, has enjoyed the fruits of the contract and treated it as valid": *Jessup* v. *Illinois R. R. Co.* 43 Fed. Rep. 483–503. And again, in *Pneumatic Gas Co.* v. *Berry*, 113 U. S. 322 (5 Sup. Ct. Rep. 525), the same distinguished judge said: "But it is not necessary to rest our judgment of affirmance of the decree of the court below upon any consideration of the character of these transactions. After seven years acquiescence in the lease, something more must be shown than that it was executed in excess of the power of the directors before the lessee can be required to surrender the profits he has made under it. The lease expired June 1, 1874. The disposition of the property was settled by the

agreement of March 15, 1876, and the release is an answer to all claims for the profits made by the defendants. The release is of itself sufficient to justify the dismissal of the bill. There is no evidence that it was obtained upon any fraudulent representations. Nothing was kept from the parties when it was executed. Indeed, all the transactions between the defendants and the company, from the time they took from Frost an assignment of the lease, were open and well known. There was no concealment had or attempted of anything that was done, and no just reason can be given for disturbing the settlement made." The same may be said here. In view of these considerations, it is manifest that after the parties have acquiesced for more than fifteen years in the settlement made by the agreement of 1876, upon the faith of which large expenditures were incurred and improvements made, and from which the plaintiffs have received commensurate benefits, and been relieved from some burdensome obligations, something more must be shown than that such contract was executed in excess of the powers of the corporation, or that the character of the transaction was such that it might have been avoided when it was made.

Thus far we have proceeded upon the hypothesis that the agreement of 1876 was voidable by the plaintiff, for the purpose of showing that, from the facts disclosed by the record, it is not entitled to avoid the contract, or to the relief asked. But we are not convinced that the agreement was in excess of the powers of the corporation. The plaintiff and the lodges are independent organizations. The plaintiff is a private corporation, and the lodges which occupy a part of the building are simply its tenants. The lower part of its building is occupied with stores. An alley such as this may be essential to the better enjoyment of the building and needful to it; and the fact that a right to use it may be given to an adjoining owner for reciprocal benefits, does not necessarily imply an excess of power·

We are inclined to the opinion that the agreement is valid, and that the parties are bound thereby; so that in any view, as we regard the case, there was no error, and the decree is AFFIRMED.